AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>A single-story house located at<br>1329 S. Center Street,<br>Santa Ana, California 92704 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 8:20-MJ-00313-DUTY

**\*\*NOTE CHANGES MADE BY THE COURT**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California  *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☒ ~~at any time in the day or night because good cause has been established~~

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

| | |
|---|---|
| Date and time issued:  <u>June 18, 2020 @ 4:26pm</u> | <u>/s/ Autumn D. Spaeth</u><br>*Judge's signature* |
| City and state:  <u>Santa Ana, CA</u> | Honorable  Autumn  D. Spaeth, U.S. Magistrate  Judge<br>*Printed name and title* |

AUSA:    <u>C. Pell (714-338-3542)</u>

AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>8:20-MJ-00313-DUTY | Date and time warrant executed: *Appd.*<br>06/24/2020 / 0600 | Copy of warrant and inventory left with:<br>SUBJECT PROMISES. |
| Inventory made in the presence of :<br>SA BRET ROGAN / SA STEVEN TIMMONS | | |

Inventory of the property taken and name of any person(s) seized:

– FORJAS TAURUS PT92, 9mm, SEMI-AUTO, HAND GUN "SERIAL # TPB64348"

– RUGER RIFLE .22 CALBER (NO SERIAL NUMBER)

– APPRox. 69 ROUNDS OF AMMO (9mm)

– (2) 9mm MAGAZINES.

– LG MOBILE DEVICE

– APPLE IPHONE MOBILE DEVICE

– HP LAPTOP

– RESIDENT ALIEN CARD

– DRIVER'S LICENCES / MISC. ID DOCS.

– MEXICO CONSULAR CARD

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 06/24/2020

_____
*Executing officer's signature*

STEVEN TIMMONS, SA/HSI
*Printed name and title*

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

The premises to be searched is described as follows: 1329 S. Center Street, Santa Ana, California 92704 (SUBJECT PREMISES #1). SUBJECT PREMISES #1 is a single-story house with a brown colored roof. SUBJECT PREMISES #1 has white colored security type rod-iron front door/screen. There is a large palm tree located to the left of the front door. In addition, the numbers "1329" are listed vertically on a support column next to the front door. SUBJECT PREMISES #1 also has an attached garage. The garage door has top windows that are rectangular in shape.

SUBJECT PREMISES #1 includes all annexes, storage areas, attics, porches, garages (including the trailer), carports, sheds or storage space assigned to the premises, mailboxes, trash containers, and debris boxes.

**ATTACHMENT B**

I. **ITEMS TO BE SEIZED**

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 8, United States Code, Section 1326(a), Title 18, United States Code, Sections 545, 922(g)(5), and 922(*l*), and Title 26, United States Code, Sections 5861(d), 5861(i), and 5861(k), which criminalize, respectively, illegal reentry by deported alien, smuggling goods into the United States, illegal alien in possession of firearm, unlawful importation of a firearm/silencer, possession and receipt of unregistered firearm/silencer, receipt of firearm/silencer without serial number, and possession and receipt of unlawfully imported firearm/silencer (collectively, the "Subject Offenses"), namely:

a.     Firearms, including silencers, firearm components, and ammunition;

b.     Records of purchase, sale, or other transfer of firearms or ammunition, or attempted purchase, sale, or other transfer of firearms or ammunition;

c.     For the time period 2015 to present, records or items showing indicia of occupancy, residence, or ownership of 1329 S. Center Street, Santa Ana, California 92704 (SUBJECT PREMISES #1) and 518 S. Sullivan Street, SPC 99, Santa Ana, California 92704 (SUBJECT PREMISES #2), such as leases, utility bills, identity documents, paystubs, bank statements, and other mail;

d.     Identity and immigration documents related to Luis Memije, also known as Luis Memije-Guzman (MEMIJE),

i

including birth certificates, marriage or divorce documents, passports, baptism records, school and medical records, U.S. social security cards or U.S. social security number-related documents, copies of applications or petitions filed with or received from U.S. immigration, California or other state identification cards, driver licenses, or other types of identification, insurance or other benefit cards, and national identity cards, such as the Mexican Consulate "matrícula consular."

e.   Documents, records, and other items relating to the use of United States Postal Service or commercial express mail delivery companies, such as FedEx and UPS, to order or receive firearms or ammunition, including air bills, and empty or previously used mailing boxes and packaging;

f.   Materials, package tracking records, and transaction receipts for mail or shipments to SUBJECT PREMISES #1 and SUBJECT PREMISES #2;

g.   Audio recordings, pictures, video recordings, or still captured images related to the possession, purchase, sale, transportation, or distribution of firearms or ammunition;

h.   3-D printing materials, printing programs and applications, and blueprints for firearms or firearm components;

i.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with sources of supply of firearms (including silencers) or ammunition, including calendars, address books, telephone or other contact lists, pay/owe

records, correspondence, receipts, records, and documents noting price, quantities, and/or times when firearms or ammunition were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, and videos;

j.   Tutorials and instructional videos on how to manufacture firearms, modify firearms, and convert other items into firearms or firearm accessories;

k.   Records of searches for firearms and/or suppressors using both regular terms and coded language, including "filter," "fuel filter," "solvent trap," "silencer," and "suppressor;"

l.   Records related to websites of importers or exporters of firearms and forearm accessories, e-commerce portals or platforms selling firearms or firearm accessories, and message boards discussing the importation, manufacture, and modification of firearms or the conversion of items into firearms;

m.   XXXXXXXXXXXXXXXXXXXXXXXXXXX;

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were

iii

created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search

iv

engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

I.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in

their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending),

vii

including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

      5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

      6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

      b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress MEMIJE's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MEMIJE's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

ix

8.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

<u>**A F F I D A V I T**</u>

I, Steven Timmins, being duly sworn, declare and state as follows:

## I.  <u>BACKGROUND OF AFFIANT</u>

1.   I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been employed by HSI since September 2009.  I am currently assigned to the Assistant Special Agent in Charge, Orange County, which is tasked with investigating child exploitation, child pornography, cybercrimes, immigration crimes, human rights violations and human smuggling, smuggling of narcotics, weapons, and other types of contraband, financial crimes, and export-import enforcement issues.

2.   Through my training and experience, and the training and experience of other law enforcement officers experienced in investigating crimes involving weapons smuggling with whom I have had discussions, I have become familiar with the methods used by people who commit these types of offenses.  My training and experience has given me an understanding of how people who commit weapons smuggling offenses use the Internet to facilitate and commit those offenses.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

3.   This affidavit is made in support of a criminal complaint and arrest warrant against Luis Memije, also known as Luis Memije-Guzman ("MEMIJE"), charging a violation of Title 8, United States Code, Section 1326(a) (Illegal Alien Found in the

1

United States Following Deportation or Removal).

4.   This affidavit is also made in support of an application for warrants to search for evidence described in Attachment B, which are the fruits, instrumentalities, and evidence of violations of 8 U.S.C. § 1326(a) (illegal reentry by deported alien); 18 U.S.C. § 545 (smuggling goods into the United States), 18 U.S.C § 922(g)(5) (illegal alien in possession of firearm), 18 U.S.C. § 922(*l*) (unlawful importation of a firearm/silencer), 26 U.S.C. § 5861(d) (possession and receipt of unregistered firearm/silencer), 26 U.S.C. § 5861(i) (receipt of firearm/silencer without serial number), and 26 U.S.C. § 5861(k) (possession and receipt of unlawfully imported firearm/silencer) (collectively, the "Subject Offenses").

5.   The two locations and vehicle to be searched are:

a.   SUBJECT PREMISES #1: A single-story house located 1329 S. Center Street, Santa Ana, California 92704, as described in more detail in Attachment A-1.

b.   SUBJECT PREMISES #2: A single-story mobile home located at 518 S. Sullivan Street, SPC 99, Santa Ana, California 92704, as described in more detail in Attachment A-2.

c.   SUBJECT VEHICLE #1: A silver colored 2014 Dodge Ram 1500 bearing California license plate number 13711R1, as described in more detail in Attachment A-3.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested search warrants, arrest warrant, and criminal complaint, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.   As set forth in greater detail below, MEMIJE, who resides at SUBJECT PREMISES #1, was the intended recipient of an international parcel, which contained a firearm silencer without a serial number that was unlawfully imported from the People's Republic of China ("PRC") in January 2020.  That parcel was addressed to MEMIJE at the address of SUBJECT PREMISES #2.

8.   As also detailed below, MEMIJE has purchased and possessed multiple firearms in California during the past several decades.

9.   Further investigation has revealed that MEMIJE is illegally present in the United States, so federal law proscribes him from possessing any firearms.  He also lied on firearms registration forms when asked whether he was illegally present in the United States.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Background on inspection of parcels at U.S. borders**

9.   United States Customs and Border Protection ("CBP")

3

must examine and admit international mail parcels and shipments
that arrive in the United States before they are delivered to
their destinations by a carrier.  CBP officers are assigned to
International Mail Facilities, like the one at the Los Angeles
International Airport ("LAX") Service Center.  CBP officers
conduct routine examinations of parcels shipped by foreign mail
services at LAX before the parcels are prepared for delivery to
their final destination.  Due to the large volume of cargo that
enters the United States on a daily basis, CBP is unable to
examine all parcels.  CBP uses a variety of methods to select
parcels for border search examination, including random and
targeted inspections.

     10.  Pursuant to their authority under Title 19, Code of
Federal Regulations, Section 162.6, CBP officers and certain
other law enforcement officers may conduct examinations of goods
entering the United States without a search warrant, probable
cause, or individualized suspicion, under what is commonly known
as "Border Search Authority."  From my training and experience
as well as my conversations with the United States Attorney's
Office, I am also aware that searches at the border generally do
not require probable cause or a warrant.

**B.   Background on Firearms and Smuggling Offenses**

     11.  From my training and experience as well as discussions
with law enforcement contacts at the Bureau of Alcohol, Tobacco,
Firearms and Explosives ("ATF"), I am aware that the National
Firearms Act ("NFA"), codified at Title 26, United States Code,
Chapter 53, regulates the importation and possession of machine

                                4

guns, short-barreled shotguns, silencers, and certain other dangerous firearms.

12. Firearm silencers, or "suppressors," are described in Title 18, United States Code, Section 921(a)(24) as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned and intended for use in assembling or fabricating a firearm silencer or firearm muffler, or any part intended only for use in such assembly or fabrication." Other common terms used for firearm suppressors are "firearm silencer," "firearm muffler," or "silencer." I have used the terms interchangeably in this Affidavit. Suppressors are a controlled item and are subject to control under the NFA.

13. In order to legally possess a suppressor, or other NFA firearm, an individual must apply and receive advance approval from the ATF. The silencer must also have a registered serial number and bear that serial number. An individual who had obtained ATF approval to receive and possess a silencer would appear on the National Firearms Registration and Transfer Record.

14. Additionally, the NFA prohibits the importation of suppressors unless they are for use by the United States, for scientific research, for testing by a registered manufacturer, or to be used as a sample by a registered importer.

15. Similarly, the Gun Control Act of 1968 ("GCA"), codified at Title 18, United States code, Chapter 44, requires that firearms imported into the United States bear a serial

5

number and restricts importation to firearms "generally recognized as particularly suitable for or readily adaptable to sporting purposes."  From conversations with the United States Attorney's Office, I am aware case law remarking that silencers are not generally recognized as being for sporting purposes. United States v. Endicott, 803 F.2d 506, 509 (9th Cir. 1986) (calling silencers as "gangster-type" devices that "serve" no innocent purpose") (quoting United States v. Luce, 726 F.2d 47, 49 (1st Cir. 1984)).

16.  I am aware that an alien admitted to the United States under a nonimmigrant visa is prohibited from shipping, transporting, receiving, or possessing a firearm or ammunition unless the alien falls within one of the exceptions provided in 18 U.S.C. 922(y)(2), such as: a valid hunting license or permit, admitted for lawful hunting or sporting purposes, certain official representatives of a foreign government, or a foreign law enforcement officer of  a friendly foreign government entering the United States on official law enforcement business.

17.  I am aware that there has been an influx of non-regulated suppressors entering United States commerce via foreign sources.  HSI is working to combat the flow of these suppressors into the United States.

a.   CBP officers report that they have intercepted suppressors, or parts of suppressors, being shipped into the United States from various senders based out of the People's Republic of China.  The intercepted packages are often mislabeled or misleadingly labeled and incorrectly manifested.

6

b.    Senders often identify the contents of the packages as "filters," "machine filter nozzle," "motorcycle filter," "fuel filter," other items with the word "filter," or "solvent traps" in the commodity description.

c.    From ATF bulletins, I know that sometimes sellers advertise silencers and silencer parts as "fuel filters" or "solvent traps."

d.    Based on my training and experience, I understand that items such as "fuel filters" and "solvent traps" are items that can be used to receive solvents while cleaning firearms, but are often used or readily modified to be used as unregistered suppressors.

e.    Legitimate solvent traps are devices attached to the muzzle of a firearm barrel designed to catch or "trap" dirty cleaning solvent pushed through the barrel from the chamber end and out through the muzzle.  Purchasers may modify these devices into unregistered silencers by simply boring a hole in the closed end, but that would prevent the device from trapping dirt or solvents.  Some devices marketed as "solvent traps" and "fuel filters" have index markings showing where to drill a hole that would modify the trap into a silencer.  Some also include silencer baffles, which are common in firearm suppressors, but which serve no legitimate purpose in a solvent trap or fuel filter.  According to the ATF, these features signal an intent to use the device as an unregistered silencer rather than a solvent trap.

**C.   Discovery of smuggled firearm silencer shipped from China and addressed to MEMIJE at SUBJECT PREMISES #2**

18.   On January 17, 2020, CBP Officer Jaime Pimental inspected and detained a United States Postal Service parcel originating from the People's Republic of China, with tracking number LW399868778CN, addressed to "Luis Memije" at SUBJECT PREMISES #2.   The parcel also listed phone number (714) 569-1071 for the addressee.   According to its U.S. Customs paperwork, the parcel was supposed to contain a "Filter."

19.   I reviewed Officer Pimental's report and the parcel's label and learned the sender of the Parcel was listed as Wenhao HE, Guangzhou Huan Yi Trade Co., Ltd, No. 6, No. 2 freight station, Yunxiao Road, Baiyun District, Guangzhou.   According to his report, Officer Pimental targeted the parcel based on his training and experience.

20.   I examined the black object inside the parcel and determined that it could be used, and likely was intended to be used, or readily modified to be used, as an unregistered silencer.   The silencer inside the Parcel had a threaded opening on one end of the cylinder, capable of attaching it to a gun muzzle, and an indent/hole on the other end, consistent with the size and location for the bullet to exit.   I disassembled the silencer and found a series of baffles, which divert propellant gasses, thus reducing the volume of shots fired through the suppressor.

**D.   Surveillance of SUBJECT PREMISES #1 and SUBJECT PREMISES #2**

21.   The shipping label on the parcel containing the

8

silencer, discussed above, listed MEMIJE as the recipient, the
delivery address as SUBJECT PREMISES #2, and phone number (714)
569-1071.

22.   Beginning in February 2020, I conducted queries in law
enforcement systems and did research on the Internet based upon
the information contained in the parcel's U.S. Customs
paperwork.

a.   California DMV records listed SUBJECT PREMISES #2
as the address for a vehicle registered to MEMIJE.

b.   California DMV records list SUBJECT PREMISES #2
as MEMIJE's current mailing address on his driver's license.

c.   Consolidated Leads Evaluation and Reporting
(CLEAR) report for MEMIJE revealed that SUBJECT PREMISES #1 is
associated with residence phone number (714) 569-1071.

d.   I obtained subscribed information for (714) 568-
1071 from Charter Communications, which provided that it was
registered to Oliverio Memije with address of SUBJECT PREMISES
#2.

e.   From the public records, SUBJECT PREMISES #1 is
listed as owned by Alberta Velez (aka Alberta Memije), and
SUBJECT PREMISES #2 is listed as owned by Oliverio Memije.

23.   On or about February 3, 2020, I conducted surveillance
at SUBJECT PREMISES #2.

a.   During that surveillance, I observed that in the
driveway at the SUBJECT PREMISES #2 was a 2018 Honda Accord
bearing California license plate number 8CXW977.  According to
California DMV records, the registered owner of that vehicle is

9

Oliverio Memije, with registered address of SUBJECT PREMIES #2.

24.  On or about February 5, 2020, I conducted surveillance at SUBJECT PREMISES #1.

   a.   I observed that the front door of SUBJECT PREMISES #1 has a security type metal screen door.

   b.   I observed that parked curbside in front of SUBJECT PREMISES #1 was a silver colored 2014 Dodge Ram 1500 bearing California license plate number 13711R1 (SUBJECT VEHICLE #1).  According to California DMV records, the registered owner of SUBJECT VEHICLE #1 is Luis MEMIJE(-Guzman), with registered address of SUBJECT PREMISES #2.

   c.   I also observed a white colored storage-type trailer with two wheels located in front of SUBJECT PREMISES #1's garage on the driveway.  I observed that the trailer's tow hitch receiver/tongue was resting on bricks.

25.  On or about February 6, 2020, I drove to both SUBJECT PREMISES #1 and SUBJECT PREMISES #2.

   a.   I observed that both the Honda Accord with license plate 8CXW977 and SUBJECT VEHICLE #1 were parked in the same locations as they had been parked on February 3 and February 5, 2020, respectively.

   b.   I also observed that the white colored trailer in front of SUBJECT PREMISES #1's garage was in the exact same location as, and had not been moved since, when I had seen it on February 5, 2020.

26.  On or about February 7, 2020, I conducted surveillance at SUBJECT PREMISES #1.  I observed that SUBJECT VEHICLE #1 was

parked at the same general location on the street in front of
SUBJECT PREMISES #1 as I had seen it parked on February 5 and 6,
2020.

  a. At approximately 8:15 a.m., I saw an unknown
Hispanic female exit SUBJECT PREMISES #1, walk to SUBJECT
VEHICLE #1, and enter the front passenger side door of SUBJECT
VEHICLE #1.

  b. Shortly after, I observed a Hispanic male whom I
recognized as MEMIJE exit SUBJECT PREMISES #1, walk to SUBJECT
VEHICLE #1, and enter the front driver's side door of SUBJECT
VEHICLE #1.

  c. Then, SUBJECT VEHICLE #1 departed SUBJECT
PREMISES #1.  I followed and observed that SUBJECT VEHICLE #1
traveled to various locations in Santa Ana, California,
including 7-Eleven and a parking lot.

  d. I also observed that the white colored trailer in
front of SUBJECT PREMISES #1's garage was in the exact same
location as, and had not been moved since, I had seen it on
February 5 and 6, 2020.

 27. On or about May 25, 2020, at approximately 10:00 p.m.,
I conducted surveillance at SUBJECT PREMISES #1.

  a. At that time, I observed that SUBJECT VEHICLE #1
was parked in front of SUBJECT PREMISES #1.

  b. I also observed that the white colored trailer in
front of SUBJECT PREMISES #1's garage was in the exact same
location as, and had not been moved since, when I had seen it on
February 5, 6, and 7, 2020.

28.   On or about June 1, 2020, at approximately 11:25 a.m., I conducted surveillance at SUBJECT PREMISES #1.

a.   At that time, I observed that SUBJECT VEHICLE #1 was parked in front of SUBJECT PREMISES #1.

b.   I also observed that the white colored trailer in front of SUBJECT PREMISES #1's garage was in the exact same location as, and had not been moved since, when I had seen it on February 5, 6, and 7, and May 25, 2020.

**E.   Law enforcement queries of MEMIJE and firearms indicate that MEMIJE has had multiple firearms registered to him.**

29.   In or about January 2020, I accessed law enforcement databases related to firearms.  Based on the results of those searches, I learned that MEMIJE has had multiple firearms registered to him.  The firearms registered to MEMIJE that I identified were:

a.   Forjas Taurus 9mm caliber semi-automatic handgun bearing serial number TPB64348.  That weapon was registered to MEMIJE with registered address of SUBJECT PREMISES #1.  The date of sale was in or about August 1999.

b.   Forjas Taurus .38 caliber revolver handgun bearing serial number MC754079.  That weapon was registered to MEMIJE at an address in Santa Ana, California (not either SUBJECT PREMISES #1 or SUBJECT PREMISES #2).  The date of sale was in or about August 1994.

i.   In February 2020, I learned from law enforcement queries that this weapon was destroyed by Santa Ana Police Department (SAPD).

12

c.    Beretta 9mm automatic handgun bearing serial number E09538Z.  That weapon was registered to MEMIJE at an address in Santa Ana, California (not either SUBJECT PREMISES #1 or SUBJECT PREMISES #2).  The date of sale was in or about December 1990.

**F.   ATF records also show that MEMIJE has purchased multiple firearms.**

30.    In February 2020, I was in contact with ATF SA David Hamilton.  SA Hamilton provided the following firearms trace summary for weapons associated with MEMIJE:

a.    On or about September 11, 1996, SAPD recovered a Weatherby .22 caliber Mark XXII rifle bearing serial number T07116, from SUBJECT PREMISES #1.  The recovery information listed MEMIJE as the possessor of the weapon.

b.    On or about July 14, 2004, SAPD recovered a Maadi 7.62 x 39 caliber Misr (AK-47) rifle bearing serial number CM0060, from MEMIJE's then residence (neither SUBJECT PREMISES #1 nor SUBJECT PREMISES #2).  The recovery information listed MEMIJE as the possessor of that weapon.  The purchase date was on or about August 1, 1997.  MEMIJE's California driver's license was used for the purchase of that weapon.

c.    On or about May 25, 2010, SAPD recovered the Forjas Taurus .38 caliber revolver handgun bearing serial number MC754079.  The purchaser information was "Luie MEMUE".  The purchaser used MEMIJE's California driver's license number "A7894780".  The purchase date was on or about September 16, 1994.

31.   In or about April 2020, I received copies of MEMIJE's signed ATF Forms 4473 – Firearms Transaction Records, which I reviewed.  ATF Forms 4473 are used so that a federally authorized firearms transferor/seller may determine whether s/he may lawfully sell or deliver a firearm to the person identified on the form, as well as to alert the transferee/buyer of certain restrictions on the receipt and possession of firearms.  From my review of those forms, I learned that MEMIJE has purchased multiple firearms in California:

a.   In September 1994, MEMIJE purchased the Forjas Taurus .38 caliber revolver handgun bearing serial number MC754079 from B & E Guns, Inc. in Cypress, California.  As required for firearms purchases/transfers, MEMIJE completed ATF Form 4473 – Firearms Transaction Record.  From a review of that form, I learned the following:

i.   MEMIJE answered "NO" on the "Certification of Transfer" regarding - Are you an alien illegally in the United States?

ii.   MEMIJE provided his California DMV license number "A7894780".

iii. MEMIJE signed his name "LUIS MEMIJE" and dated "09-16-94".

iv.   The transferor's transaction number was "60557".

b.   In August 1997, MEMIJE purchased the Maadi, 7.62 x 39 caliber Misr (AK-47) rifle bearing serial number "CM00609" from Turner's Outdoorsman in Fountain Valley, California.  As

14

required for firearms purchases/transfers, MEMIJE completed ATF Form 4473 – Firearms Transaction Record.  From a review of that form, I learned the following:

        i.  MEMIJE answered "NO" on the "Certification of Transfer" on the question "Are you an alien illegally in the United States?"

        ii.  MEMIJE provided his California DMV license number A7894780.

        iii. MEMIJE signed his name "LUIS MEMIJE" and dated 8-1-97.

        iv.  The transferor's transaction number was 09144.

        c.  In September 1999, MEMIJE purchased the 9mm handgun bearing serial number TPB64348.  As required for firearms purchases/transfers, MEMIJE completed ATF Form 4473 – Firearms Transaction Record.  From a review of that form, I learned the following:

        i.  MEMIJE answered "NO" on the "Certification of Transfer" on the question "Are you an alien illegally in the United States?"

        ii.  MEMIJE provided his California DMV license number A7894780.

        iii. MEMIJE signed his name as "LUIS MEMIJE" and dated 9-2-99.

        iv.  The state transaction number was 1699-0162.

        d.  According to my review of the records, law enforcement has destroyed all the of the above weapons after

seizing them, except for the 9mm handgun bearing serial number TPB64348, which has never been recovered from MEMIJE.

**G.   In 1996, SAPD Narcotics Unit seized firearms from SUBJECT PREMISES #1 while MEMIJE lived there.**

32.  In early 2020, I obtained records from SAPD investigation numbers 96-41944 and 04-30041, which were related to MEMIJE.  From my review of those records, I learned the following:

33.  On or about September 11, 1996, SAPD Narcotics Unit executed a state search warrant at SUBJECT PREMISES #1, during which officers recovered multiple weapons inside SUBJECT PREMISES #1.

a.   The weapons that were recovered inside SUBJECT PREMISES #1 included the Forjas Taurus .38 caliber revolver handgun bearing serial number MC754079 and Weatherby .22 caliber Mark XXII rifle bearing serial number T07116, discussed above, as well as a third weapon - a Norinco, 7.62 x 39 caliber Mak-90 assault rifle bearing serial number 9364139.

b.   In addition, SAPD seized three Mak-90 magazines, a gram scale, ammunition, marijuana plants, a phone bill, and photographs of MEMIJE brandishing an assault rifle.

c.   Based on interviews with subjects during the execution of the search warrant, it was determined that MEMIJE lived at SUBJECT PREMISES #1 at that time.

i.   The Forjas Taurus .38 caliber revolver handgun bearing serial number MC754079, 7.62 x 39 caliber Mak-90 assault rifle bearing serial number 9364139, Mak-90 magazines,

16

ammunition, and photographs were found in the southwest bedroom.
The Weatherby .22 caliber Mark XXII rifle bearing serial number
T07116 was found in the garage at SUBJECT PREMISES #1.

          ii.   During interviews, subjects at the residence
advised SAPD that MEMIJE resided in the southwest bedroom.

**H.   In 2004, MEMIJE's wife confirmed that MEMIJE kept multiple**
    **firearms inside his residence.**

    34.   On or about July 14, 2004, Fidela Sanchez called "9-1-
1" for spousal domestic violence.   During the interview Sanchez
reported the following:

        a.   She said that her cohabitating spouse, MEMIJE,
had "tried to kill" her.

        b.   Sanchez said that around 11 p.m. the night
before, MEMIJE had come to her place of employment and told her
"You are going to get it."

        c.   When she arrived at their house around 11:45
p.m., MEMIJE engaged in an argument with Sanchez.

        d.   MEMIJE began to call her "a whore" because she
had eaten lunch with a couple of her male coworkers, without his
knowledge.

        e.   MEMIJE then threw her against the floor.

        f.   As Sanchez lay on the floor, MEMIJE charged at
Sanchez and grabbed her neck with both hands and began to choke
her.

        g.   She said she grabbed MEMIJE's hair to stop the
choking.

        h.   Sanchez said she managed to fight off MEMIJE and

tried to call the police from the living room; however, MEMIJE unplugged the phone.

   i. She said that she then ran to her bedroom and locked herself in, and called the police.

   j. Sanchez stated that MEMIJE had several firearms in their home, including a firearm in the nightstand.

   k. After the interview, SAPD took custody of a Maadi assault rifle, which was located in the closet of their residence.  However, the firearm in the nightstand was missing. As discussed immediately below, MEMJIE admitted that he had moved that firearm to a relative's location the previous night.

**I.** **In 2004, MEMIJE confirmed that he had a firearm in his residence, which he said he had just removed to his cousin's mobile home.**

   35. On or about that same day (July 14, 2004), MEMIJE traveled to the SAPD to inquire about an outstanding emergency protective order against him.

   36. SAPD then interviewed MEMIJE at SAPD.  From my review of the report of that interview, I learned the following information:

   a. MEMIJE had discovered that Sanchez had gone to lunch with a male coworker.  After discussion, Sanchez charged at him, so MEMIJE said he just protected himself.

   b. MEMIJE stated that the night prior to this incident, he had taken a 9mm gun to his cousin's home, which he said was located in a mobile home on Sullivan in Santa Ana. MEMIJE said he took the gun there because he was afraid that his

wife Sanchez would use it on him.

c. After the interview, MEMIJE was arrested by SAPD for violating California Penal Code Section 273.5(a) (felony spousal abuse). The final disposition was release by the prosecutor for lack of sufficient evidence.

37. As noted above, SUBJECT PREMISES #2 is a mobile home located on Sullivan Street in Santa Ana (Space 99, 518 S. Sullivan Street, Santa Ana, California), which is currently listed as MEMIJE's address with California DMV.

**J.**  **The item shipped from China addressed to MEMIJE at SUBJECT PREMISES #2 is a silencer prohibited under federal law.**

38. In February 2020, I presented to ATF SA David Hamilton photographs of the suspected silencer that had been mailed from China addressed to MEMIJE at SUBJECT PREMISES #2. According to him, the components and the device design are consistent with other devices that ATF has classified as "firearm silencers."

39. Although a definitive classification would have to be made by a qualified laboratory, such as ATF's Firearms and Ammunition Technology Division, based upon my training and experience, including discussions with AFT agents, I believe that the recovered device is a "firearm silencer" as defined under 18 U.S.C. § 921(a)(24), and as a "firearm" as defined under 18 U.S.C. § 921(a)(3) and 26 U.S.C. § 5845(a). The lack of a serial number and other manufacturer markings precludes registration of this firearm in the National Firearms Registration and Transfer Record (NFRTR).

**K.    MEMIJE lacks immigration status in the United States.**

40.   I learned from ICE and federal law enforcement databases that Alien File Number ("A-File") A98 949 595 was assigned and maintained for MEMIJE.

41.   Based upon my training and experience, I know that an A-File is a file in which immigration records are maintained for aliens admitted to or otherwise found in the United States.  The A-File usually contains photographs, fingerprints, court records of conviction, and records relating to deportation or other actions by DHS with respect to the subject alien for whom the A-File is maintained.  Further record checks revealed that MEMIJE was removed to Mexico.

42.    In or about April 2020, I reviewed MEMIJE's A-File. My review of MEMIJE's A-File revealed the following information and documents:

a.   A Record of Deportable Alien (Form I-213) dated August 17, 2005, which indicated that a U.S. Border Patrol Senior Agent had responded to thirteen individuals jumping the border fence approximately eighteen miles east of the Tecate, California, Port of Entry into the United States.

i.   MEMIJE was one of those thirteen individuals, and he stated that he was a citizen and national of Mexico, born in Guerrero, Mexico, without any immigration documents to enter or remain in the United States.

b.   An Order of Removal dated August 29, 2005, showing that MEMIJE was ordered removed from the United States to Mexico by Ronald J. Smith, Field Director, San Diego,

California.

      c.   On or about August 29, 2005, MEMIJE was ordered removed from the United States to Mexico by Immigration Judge Robert J. Barrett.

      d.   An executed Warrant of Removal/Deportation indicates that MEMIJE was officially removed and deported from the United States to Mexico on August 29, 2005, at the Port of Entry, San Ysidro, California.

      i.   I know from my training and experience that a Warrant of Removal/Deportation or a Verification of Removal is executed each time a subject alien is removed and deported from the United States by ICE (or its predecessor agency, INS) and usually contains the subject's photograph, signature, and/or fingerprint.

      ii.   The executed Warrants of Removal/Deportation and the Verification of Removals in MEMIJE's A-File contains his signature, fingerprint, and photograph.

43.   I then obtained a photograph from California DMV bearing the name Luis MEMIJE, license number Y3018710 (prior license number) with date of birth August 25, 1967.  I compared MEMIJE's California DMV photograph to the photographs contained in the immigration records under MEMIJE's identifying information.  It appeared to me that MEMIJE's California DMV photograph and the immigration record photographs under MEMIJE's identifying information appear to be the same person.  Thus, I believe that A-file A98 949 595 corresponds to MEMIJE.

44.  Based on my training and experience, I know that the
ICE computer indices, track and document each time an alien is
deported from the United States by ICE (or its predecessor
agency, INS) or is granted permission to enter or re-enter the
United States.  The ICE computer indices confirmed that MEMIJE
had been removed and deported on the dates indicated on the
Warrants of Removal/Deportation and the Verification of Removal
found in MEMIJE's A-File. The ICE computer indices further
indicated that MEMIJE had not applied for or obtained permission
from the Attorney General or his designated successor, the
Secretary of Homeland Security, to re-enter the United States
legally since MEMIJE had last been deported.

45.  Based on my review of MEMIJE's A-File, I determined
that his A-File does not contain any record of his ever applying
for or receiving permission from the Attorney General or his
designated successor, the Secretary of Homeland Security, to
legally re-enter the United States.  Based on my training and
experience, I know that such documentation is required to
re-enter the United States legally after deportation, and that
if such documentation existed, it would ordinarily be found in
MEMIJE's A-File.

46.  Based on my review of the contents of A-File A98 949
595, in particular the Warrants of Removal/Deportation and the
Verification of Removal notice indicating that MEMIJE had been

22

removed and deported to Mexico, and my training and experience,
I believe that MEMIJE is an alien, that is, a citizen of Mexico
who illegally re-entered the United States without permission.

### V.    TRAINING AND EXPERIENCE ON IMMIGRATION OFFENSES

47.  Based upon my training and experience, including
discussions with other experienced HSI SAs, I know that
individuals often keep their identity and immigration related
documents at their residence or other storage locations, so that
they can readily access those documents.  Such documents include
proof of identity as well as foreign nationality or alienage,
including birth certificates, passports, baptism records, and
school and medical records, copies of applications or petitions
filed with U.S. immigration, and national identity cards.

### VI.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

48.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct firearms investigations, I am aware of the
following:

a.    Persons who possess, purchase, import, or sell
illegal firearms, such as unregistered suppressors, generally
maintain records of their firearm transactions as items of value
and usually keep them in their residence, or in places that are
readily accessible, and under their physical control, such in
their digital devices.  It has been my experience that
individuals who own, import, and deal firearms illegally will

keep the contact information of the individual who is exporting or otherwise supplying firearms for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices, or of firearms that they wish to sell to others.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Importers of NFA firearms, and products intended to be converted into NFA firearms, often use the Internet to source and purchase these items.  The digital devices of importers often include Internet searches and browsing history of the websites of foreign firearm exporters, online messaging boards used by other firearm importers and exporters, cookies from exporter websites and proprietary e-commerce portals as well as third-party e-commerce platforms on which firearm exporters list their products, and tutorials and instructional videos on how to manufacture NFA firearms, modify firearms, and convert other items into firearms or firearm accessories.

d.   Correspondence between persons importing and exporting or buying and selling firearms, including correspondence between co-conspirators in the illegal dealing of firearms, often occurs over phone calls, e-mail, text message, and social media messages to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation

of price.  In my experience, individuals purchasing firearms
from international sellers use phone calls, e-mail, messaging
applications, and text messages to communicate with each other
regarding firearms.

e.  People who collect firearms are often gun
enthusiasts, who can make their own weapons or modify components
sourced from various sellers and distributors.  It is also
possible to build firearms and firearm components using 3-D
printing technology.  Gun enthusiasts often obtain firearm
components and 3-D printing materials, including blueprints,
from the Internet and through networks of other gun enthusiasts.
Communications between such individuals often occur over
telephone, email, text, and messaging applications.

f.  Ammunition is often maintained nearby firearms.

g.  When firearms and/or narcotics or narcotics
paraphernalia, such as scales, are maintained, there is often
also large amounts of currency.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

49.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is

---

[1] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

often retrievable from digital devices:

       a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be

evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted

50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple

gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

51.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

28

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MEMIJE's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MEMIJE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

52.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.      REQUEST FOR AUTHORIZATION FOR NO-KNOCK ENTRY

53.   Based upon my background, training, and experience, and knowledge of this investigation, I have reasonable suspicion that knocking and announcing law enforcement's presence at SUBJECT PREMISES #1 and SUBJECT PREMISES #2 prior to executing the warrants would be dangerous.

54.   For the following reasons, I believe there are serious safety concerns with executing the search warrants at SUBJECT PREMISES #1 and SUBJECT PREMISES #2:

a.   As detailed above, MEMIJE has stored an assault rifle in the bedroom closet of his residence.

b.   As detailed above, MEMIJE's wife said that he has stored a semi-automatic hand gun in the bedroom night stand of his residence.

c.   As detailed above, I observed that SUBJECT PREMISES #1 has a metal "security type" front screen door.  That metal door prevents individuals from looking inside the

residence from outside.

        d.    As described above, law enforcement has responded to a report of domestic violence by MEMIJE.

        e.    SUBJECT PREMISES #1 and SUBJECT PREMISES #2 are located in a high gang territory area.  Specifically, based upon my discussions with other agents and other law enforcement personnel, I know the SUBJECT PREMISES are known to be claimed areas of the Townsend Street gang, Sullivan Street gang, Golden West gang, and Barrio Southside gang, in Santa Ana.

55.  No-knock authorization will provide HSI and its agency partners with the opportunity to enter the properties identified in Attachments A1-A2 while those properties' occupants are sleeping, which will mitigate the concern that the occupants will access firearms or other weapons.

56.  Thus, based upon officer safety concerns, I request that the Court authorize no-knock execution of the search warrants for SUBJECT PREMISES #1 and SUBJECT PREMISES #2.

IX.  **REQUEST FOR NIGHTTIME SERVICE**

57.  I also request that the Court authorize law enforcement to execute the search warrants for SUBJECT PREMISES #1 and SUBJECT PREMISES #2 at any time in the day or night, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).

58.  Good cause exists for nighttime service here because of officer safety concerns detailed in the paragraphs above supporting no-knock authorization.  The ability to serve the requested warrants at any time in the day or night will provide

law enforcement with a better opportunity to enter the

properties without incident to make everyone's safety.  Given

the facts of this case and firearms involved, I believe that

nighttime service is warranted in this case.

**DENIED**

### X.   CONCLUSION

59.  For all the reasons described above, there is probable
cause to believe that MEMIJE violated 8 U.S.C. § 1326 (Illegal
Alien Found in the United States Following Deportation or
Removal).

60.  Further, for all the reasons described above, there is
probable cause to believe that the items listed in Attachment B,
which constitute evidence, fruits, and instrumentalities of
violations of the Subject Offenses, will be found in SUBJECT
PREMISES #1, SUBJECT PREMISES #2, and SUBJECT VEHICLE #1, as
described in Attachments A-1, A-2, and A-3, respectively.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __18__ day of June
2020.


___/s/ Autumn D. Spaeth_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE